KAMI KOUNTRY BROADCASTING COMPANY, A CORPORATION, APPELLANT, V. UNITED STATES FIDELITY AND GUARANTY COMPANY, A CORPORATION, APPELLEE.

208 N. W. 2d 254.

Filed June 8, 1973. No. 38707.

Joseph F. Chilen of Denney & Chilen, for appellant.

Maupin, Dent, Kay, Satterfield, Girard & Scritsmier, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, NEWTON, and CLINTON, JJ.

CLINTON, J.

This is an action on a fidelity bond to recover losses allegedly suffered by the plaintiff KAMI Kountry Broadcasting Company, a corporation, through fraudulent and dishonest acts of its general manager, Dean L. McLain, whose fidelity was insured by the bond.

The defendant insurer filed in the District Court a motion to strike, on the grounds of immateriality and their conclusionary nature, certain specific allegations of the plaintiff's sixth cause of action, which is the only cause involved on this appeal. The District Court sustained the motion, ordered the allegations stricken, and dismissed the sixth cause of action without prejudice. The plaintiff appeals and we affirm.

The pertinent allegations of the petition are the following: The execution and delivery by the plaintiff to the defendant of the bond which insured the plaintiff against ". . . any loss of money or any other property which the insured shall sustain . . . through any fraud-

ulent or dishonest act or acts committed by any of the employees, acting alone or in collusion with other, while in any position at any location in the service of the insured. . . .

"2. That while said employee was in charge of said radio station, and between March 11, 1970 and July 6, 1970 without permission or authorization of the Plaintiff or George Powers, its president, forged the president's signature on a promissory note in the amount of Four Thousand Dollars ($4,000.00) to the First National Bank, Cozad, Nebraska; and wrongfully appropriated the proceeds thereof to his own use.

"3. That the First National Bank of Cozad was one of the largest advertisers of the Plaintiff; that the Plaintiff was incorporated during the month of February of 1970.

"4. That the First National Bank of Cozad intimated that it would no longer advertise with the Plaintiff unless the Plaintiff paid the note to the First National Bank.

"5. That the Plaintiff paid to the First National Bank of Cozad, Nebraska the sum of $4,000.00 with interest of $37.84 in payment of said promissory note which was illegally and wrongfully forged by said employee by executing to the Bank a new promissory note."

In its order striking the allegations of paragraphs numbered 2 to 5 inclusive and dismissing the sixth cause of action, the court found that: "there was no legal liability on the part of plaintiff KAMI Kountry Broadcasting Company to pay the First National Bank of Cozad the sum of $4,000.00 plus interest as set forth in the Sixth Cause of Action contained in the plaintiff's Amended Petition." The court also in its order striking and dismissing included an order adjudging that there was no liability by KAMI to pay the bank the sum of $4,000.

KAMI does not on this appeal complain that it was not permitted to amend its sixth cause prior to dismissal, and the briefs of both parties are directed to

the question of whether or not the plaintiff is entitled to recover if the facts of the pleaded but stricken allegations are true. Accordingly we look at this matter the same as if a demurrer had been sustained and the plaintiff had elected to stand on its petition and dismissal had followed.

The pleadings present the concise issue of whether the defendant is liable on the bond because KAMI, in order to avoid the loss of a customer, paid the note forged by its manager and on which it was not legally liable and from which it did not receive the proceeds.

Section 3-404, U. C. C., provides: "(1) Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it; . . . ." See, also, Farmers Union Coop Assn. v. Commercial State Bank, 187 Neb. 376, 191 N. W. 2d 168. Section 1-201(43), U. C. C., states: " 'Unauthorized' signature or indorsement means one made without actual, implied or apparent authority and includes a forgery." Comment 4 to section 3-404, U. C. C., is as follows: "The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; and to recognize the negligence which precludes a denial of the signature."

KAMI has not pleaded any facts which would indicate it was precluded from asserting the defense of forgery as against the bank. Estoppel, if it constitutes the foundation for a cause of action, must be pleaded. Robbins v. National Life & Acc. Ins. Co., 182 Neb. 749, 157 N. W. 2d 188; Nebraska Mortgage Loan Co. v. Van Kloster, 42 Neb. 746, 60 N. W. 1016; Diehl v. Johnson, 123 Neb. 699, 243 N. W. 901.

The alleged facts disclose KAMI suffered no direct loss as a result of the fraudulent acts of its manager. The pleadings indicate this fraud was directed at the

bank and that it was the one defrauded by the acts of KAMI's manager. KAMI lost only when it determined to pay the bank.

The parties cite no Nebraska case in point. We believe the reasoning of the Supreme Court of Kansas in Ronnau v. Caravan International Corp., 205 Kan. 154, 468 P. 2d 118, applies in this case. There the plaintiff suffered damage by reason of the fraud of employees of the indemnitee in the bond. The indemnitee became insolvent. The plaintiff obtained a default judgment against the indemnitee and then brought garnishment proceedings against the indemnitor insurance company. The Supreme Court of Kansas approved the holding of the lower court denying liability, saying: "With respect to Claim One, the district court concluded the bond issued to Caravan by INA did not insure Caravan against liability to third parties and imposed no obligation upon INA to indemnify creditors of Caravan, such as the appellant; that the bond was not a third party beneficiary contract, nor a contract of insurance against liability; that the purpose and intent of the bond was to indemnify Caravan against direct losses of money or property through employee dishonesty—not to insure Caravan against liability to third parties; that Caravan had not sustained a direct loss of money or property by reason of appellant's judgment, and that the judgment was not a loss to Caravan within the coverage of the bond. . . .

"The appellant maintains that, in support of Claim One, the focal point of this issue is the fact the Blanket Honesty Bond is, at least in part, a policy of liability insurance, which insures against liability of Caravan to third persons, including himself. He contends that one policy of insurance may indemnify against both direct loss and against liability. He asserts the policy indemnifies or insures against four conditions, and that the third coverage—loss of money or other property for which the insured is legally liable—in consequence of fraudulent and dishonest acts of Caravan's employees,

indemnifies against both direct loss and against liability. He argues that INA, as garnishee under the policy, agreed to insure Caravan for any loss of money or other property for which it was 'legally liable'; that Caravan sustained a loss by the fraudulent conduct of its employees, and legal liability therefor was established by the judgment below in favor of appellant; that to hold otherwise would be to eliminate the words 'for which the Insured is legally liable' from the policy, which cannot be done; that the words are clear and unmistakable and are to be construed in their natural and ordinary meaning; that no other provisions of the policy control their meaning, and the indemnity being against liability under the third coverage of the policy, INA became liable to appellant upon determination of Caravan's liability to him by reason of the judgment rendered on Count II of the petition.

"We cannot agree with appellant's construction of the bond. The insuring clause and other pertinent provisions of the bond have been set forth. In clear and unambiguous terms, INA agreed to indemnify Caravan against loss of money or other property caused by 'fraudulent or dishonest' acts of its employees. The category of insurance contracts into which the Blanket Honesty Bond falls is termed fidelity guaranty insurance. A fidelity bond is an indemnity insurance contract whereby one for consideration agrees to indemnify the insured against loss arising from the want of integrity, fidelity or honesty of employees or other persons holding positions of trust. Such a contract is considered to be one on which the insurer is liable only in the event of a loss sustained by the insured. It is direct insurance procured by him in favor of himself, as contrasted with bonds running to the benefit of members of the public harmed by the misconduct of the covered individual, which bonds are third-party beneficiary contracts (13 Couch on Insurance 2d, §§ 446:1, 446:2.)'"

It is true that in this case the action is brought by

the indemnitee. However, the reasoning in the cited case applies and the situation here would be the same had the bank not been paid by KAMI and the bank sought recovery on the bond.

Another and older decision of the Supreme Court of Indiana in accord is National Surety Co. v. Fletcher Sav. & Trust Co., 201 Ind. 631, 169 N. E. 524. In that case, insofar as it is applicable here, the Indiana court held the conduct of the manager of a corporation in making false representations to banks as to the financial condition of the corporation in order to secure corporate loans did not afford a basis for the bank to recover from the insurance company on the fidelity bond since the loss was not sustained by the corporation.

The original loss suffered by the bank in this case is not, under the facts alleged, converted into a direct loss by the insured because it determined to pay the bank on an obligation for which it was not liable.

AFFIRMED.

McCOWN, J., dissenting.

The District Court not only dismissed the sixth cause of action but also specifically held and decreed that "there was no legal liability on the part of plaintiff KAMI Kountry Broadcasting Company to pay the First National Bank of Cozad the sum of $4,000 plus interest as set forth in the Sixth Cause of Action contained in the plaintiff's Amended Petition."

The majority opinion correctly equates the dismissal of the sixth cause of action with sustaining a demurrer and at least tacitly concedes that the finding there was no legal liability on the part of plaintiff to pay the First National Bank of Cozad the sum of $4,000 plus interest may be equated with the granting of a judgment on the pleadings or a summary judgment.

The parties' arguments and contentions are all directed at issues grounded on the legal effect of the forged promissory note. The majority opinion adopts the same approach. All have concentrated on whether the forged

promissory note was legally and contractually binding on the plaintiff to the exclusion of other critical issues. Even if it be assumed that the defendant is correct and that the forged signature is wholly inoperative to bind the plaintiff on contract liability for the note, that does not affect the possible tort liability of the plaintiff to the bank for $4,000 for the fraud of its agent and general manager. It is obvious that if the manager of the radio station forged the $4,000 note and wrongfully appropriated the proceeds to his own use he committed a fraud upon the plaintiff or the bank or both.

While the pleadings may be inept and skeletal as to some details, they establish that Dean L. McLain, while he was acting as general manager of the plaintiff in charge of its radio station, without authority forged the signature of the plaintiff's president on a promissory note in the amount of $4,000 to the First National Bank of Cozad, Nebraska, and wrongfully appropriated the proceeds thereof to his own use. The pleadings also specifically allege that plaintiff later paid to the bank the sum of $4,000, plus interest, in payment of the promissory note.

Other portions of the pleadings and exhibits establish that plaintiff's bank account was maintained at the First National Bank of Cozad and that McLain had authority to and did write checks on that account, many of which were unauthorized and fraudulent. Reasonable inferences may be drawn that the forged note purported to be a note of the plaintiff, signed by its president, and that the proceeds of the forged note were delivered by the bank and received by McLain in his capacity as general manager of the plaintiff. While the allegation that McLain "wrongfully appropriated the proceeds thereof to his own use" might well have been subject to a motion to make more definite and certain as to details, that was not done. Taken in the light most favorable to plaintiff, if McLain appropriated the proceeds from the bank account of the plaintiff, there was a loss of

plaintiff's money or property within the language of the fidelity bond.

At this point it is also appropriate to note that the fidelity bond was not limited to money or property owned by the insured. Section 7 of the bond provides: "The insured property may be owned by the Insured or held by the Insured in any capacity whether or not the Insured is liable for the loss thereof, or may be property as respects which the Insured is legally liable."

Restatement, Agency 2d, section 261, provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Comment a to this section states: "The principal is subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Illustration 1 involves a forged document delivered by a bank employee who received payment for it.

Restatement, Agency 2d, section 262, provides: "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this." The comment to this section, in expressing the rationale for the rule states: "It is, however, for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are pur-

porting to act and are apparently acting in the interests of the principal."

Restatement, Agency 2d, section 161, provides: "A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized."

Section 1-103, U. C. C., provides: "Unless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

Section 3-404, U. C. C., quite clearly provides that any unauthorized signature to a promissory note is wholly inoperative unless ratified, and that any unauthorized signature may be ratified. Comment 3 to that section establishes that a forgery may be ratified and that such adoption or ratification is retroactive and may be found from conduct as well as from express statements. In this case, payment of the note to the bank by the plaintiff after full knowledge of the facts constituted ratification. The only real issue is whether there was any legal liability of plaintiff to the bank arising out of the acts of McLain in obtaining the $4,000 from the bank, or whether the ratification was voluntary.

The facts pleaded here and the reasonable inferences from them were sufficient to withstand demurrer. Neither was the defendant entitled as a matter of law to a judgment that there was no legal liability on the part of plaintiff to pay the First National Bank of Cozad the sum of $4,000 plus interest. Such determinations should await the presentation of evidence. No evidence has yet been presented.

If there was a legal liability on the plaintiff to respond in tort to the bank for the fraud of McLain, the payment of $4,000 to the bank was clearly a loss covered by the bond. The cases cited in the majority opinion simply do not reach such an issue.

The judgment of the District Court should have been reversed and the cause remanded to determine whether the evidence could or would support the possible tort liability of the plaintiff to the bank for the fraud of plaintiff's agent and general manager.

SPENCER, J., joins in this dissent.